**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DOLLIE MAINOR, | |
| Plaintiff, | |
| v. | No. 03 C 9102<br>Judge James B. Zagel |
| CHICAGO TRANSIT AUTHORITY and<br>CHARLES WILLIAMS, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

*Background*

Plaintiff Dollie Mainor filed a Complaint alleging that she was subjected to sexual harassment by Defendant Charles Williams while both were employed by Defendant Chicago Transit Authority (CTA). Her Complaint asserts causes of action under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1974, 42 U.S.C. § 2000 *et seq*. Mainor, a bus operator, alleges that Williams, a bus service supervisor, sexually harassed her on four separate occasions.

The parties agree that prior to the first incident, Mainor and Williams were not well acquainted and had only seen each other in passing. Mainor testified that she had never before met nor spoken to Williams. Williams testified that he could recall having seen her only once before, at which time the two exchanged just a few words.

The first incident occurred on the night of December 29, 2002, at the Lakefront and 79th Street CTA Terminal where Mainor had just returned a borrowed bathroom key to her bus leader. Mainor had lost her own set of keys one month earlier. Williams approached Mainor as she was walking toward her bus. After a brief conversation, Williams allegedly "grabbed [Mainor] by the

back of her head . . . and shoved his tongue in her mouth."[1] (Pl.'s SOF ¶ 6; Mainor Dep. at 28.) Mainor states that she pushed him off of her and told him "no." (Pl.'s SOF ¶¶ 7-8; Mainor Dep. at 28.) Williams testified that, prior to his physical advances, he deliberately moved out of the view of the bus's cameras because he "didn't want to get caught up into no situation [*sic*]" on video. (Williams Dep. at 43.)

Williams then asked Mainor to get into his CTA sport utility vehicle (SUV). Mainor alleges that she had already started back toward her bus when Williams lured her into his car with the promise of a switchback slip.[2] Mainor wanted the slip because she was running behind on her schedule. While in the SUV, Mainor alleges that Williams asked whether she had a boyfriend and put his hand between her thighs. Mainor told him to stop and got out of the SUV.

The next day, December 30, 2002, Mainor called her supervisor, CTA manager Elzie Washington, and complained about the sexual harassment occurring the night before. Washington advised Mainor to come into the 77th Street Garage the following day to make a formal report. Washington also reported Mainor's complaint to CTA manager Stanley Parish.

The second incident occurred on December 30, 2002, and began when Williams recognized Mainor's lost Mickey Mouse key chain at the 79th and Cottage Grove CTA bus shanty. Although the supervisor working at the bus shanty told Williams to "just leave the keys,"

---

[1]According to Mainor, Williams asked her why she was on another driver's bus; she explained that she borrowed her bus leader's keys because she recently lost her own. Defendants deny this and claim that Mainor had promised Williams "a Christmas hug and kiss" at an earlier point and that Williams told Mainor that he wanted to collect on that promise. (Williams Dep. at 39.) The parties agree that at some point during the exchange, Mainor described her lost keys to Williams as having a Mickey Mouse key chain.

[2]A switchback slip, which may be issued by a bus service supervisor, puts a bus operator back on schedule by sending a bus express from one point to another without stopping.

(Williams Dep. at 58), Williams insisted on taking the keys so that he could personally return them to Mainor. Williams then went to the 77th Street Garage and persuaded bus clerk Betty Spivey to look up Mainor's name and telephone number in CTA's master file.[3] Spivey called Mainor, informed her that a supervisor wanted to speak with her, and handed the phone to Williams.

On the phone, Williams told Mainor that he had found her keys, and offered to bring them to her house. Mainor recognized Williams' voice from the night before and asked him not to come to her house since she could pick up the keys from work. Twenty minutes later, Williams arrived at Mainor's house. Mainor alleges that she tried to open her door only wide enough to retrieve her keys, but that Williams nonetheless made his way through the door.

Mainor alleges that, while standing in the vestibule of her house, Williams pulled her toward him, grabbed her breast and tried to kiss her. It is undisputed that before Williams left Mainor's house, she told him that she was offended by his conduct.[4] On December 31, 2002, Mainor reported the December 30, 2002 sexual harassment to CTA. Mainor also filed a complaint against Williams with the Chicago Police Department alleging a sex offense.

The third incident occurred on January 2, 2003, at the 77th Street Garage, when Williams allegedly stared at Mainor in a threatening manner. While Defendants deny that Williams saw

---

[3] Until this point, Williams did not know Mainor's name. Williams was only able to obtain her name by providing information about Mainor's bus route and asking Spivey to lookup up the driver assigned that route on the previous night.

[4] Mainor testified that she told Williams "you keep offending me by getting into my personal life; and I don't appreciate it." (Mainor Dep. at 56.) Williams testified that "she stated that I was disappointed in you, the hug the kiss [sic]," meaning that "she was disappointed in [sic] what happened the night before." (Williams Dep. at 64-67.)

3

Mainor that day, it is undisputed that Mainor complained about this incident to two CTA Transportation Managers, Barbara Keaton and Delois West. The next day, Mainor began a medical leave of absence which continued until April 14, 2003. Mainor claims to have suffered from depression and post-traumatic stress disorder as a result of the alleged sexual harassment.

The fourth incident occurred on April 21, 2003, a week after Mainor returned from medical leave. Mainor alleges that, when she saw Williams at the Chicago State University Terminal, he stared at her in a threatening way and gave her a "nasty sexual grin."[5] (Mainor Dep. at 73-74.) Immediately after this incident, Mainor complained to CTA.[6] Mainor took a medical leave of absence from April 21, 2003 to December 11, 2003, for post-traumatic stress disorder, contending that CTA refused to stop the sexual harassment.

In response to Mainor's complaints about the first two incidents, CTA Transportation Manager Stanley Parish interviewed Williams and conducted an investigation of Mainor's

---

[5] In motions to strike filed subsequent to the fully briefed motion for summary judgment, each party takes issue with the opposing party's support for certain evidentiary facts. For example, Defendants admitted that, "on April 21, 2003, Plaintiff saw Williams at CTA Chicago State university terminal." (Defs.' Resp. to Pl.'s SOF ¶ 47.) In Plaintiff's response to Defendants' statement of material fact ¶ 78, Plaintiff again stated that, "On April 21, 2003, plaintiff saw Williams at CTA Chicago State University terminal." Having previously admitted this very fact, Defendants now seek to strike it, arguing that "the plaintiff's citation to the record does not support plaintiff's statement." (Defs.' Mot. to Strike at 2.) While arguably raising a legitimate ground for dispute of the fact, Defendants' motion to strike flatly contradicts their prior admission of the same fact. Moreover, I found sufficient evidentiary support for the statement in the record. (Pl.'s App. of Ex. in Resp. to Defs.' Mot. for Summ. J., Ex. 5.)

I offer this by way of example. I have included here only those facts supported by the record, and construe all factual disputes in favor of the non-movant, as I must on a motion for summary judgment. To that end, the parties' motions to strike are granted and denied as reflected in the facts presented within this opinion.

[6] According to CTA's report, Mainor complained that she was "nervous and scared due to a past incident when she alleged she was harassed by the supervisor [Williams]," and said "[s]he can't work under these conditions." (Washington Dep., Ex. 15).

allegations. On January 8, 2003, Williams was disciplined with a 21-day suspension and ordered to attend an EEO class on sexual harassment. That same day, Parish asked Mainor what remedy she sought. Mainor requested that she be transferred to North Park Garage, and also warned Parish that she had contacted an attorney.

CTA took no action to transfer either Mainor or Williams.[7] It is not clear from the record whether Parish learned of Mainor's complaints to CTA managers Keaton and West about the third incident. In any case, Parish testified that he does not recall having spoken with either Keaton or West, or having read either manager's written report regarding the alleged third incident.

In response to Mainor's complaint about the fourth incident, CTA manager Elzie Washington filed a written report. Washington testified that Mainor told him that Williams had "grinned at her and that made her feel unsafe . . . and she shouldn't be working under those conditions." (Washington Dep. at 101-102.) Washington is "unaware," however, of whether or not he ever spoke to Williams about Mainor's allegations. (*Id*. at 107-108.) Washington is also unsure about whether he ever mentioned Mainor's allegations to Parish. Williams testified that he had discussed Mainor's allegations with two CTA managers, Stanley Parish and "Mr. Thurmond,"[8] shortly after the fourth incident.[9] (*Id*. at 111). Parish, however, testified that he had

---

[7]Mainor remained assigned to the 77th Street Garage until December 2003, when she was transferred to North Park Garage.

[8]No first name was provided.

[9]Williams also testified that, at the time of his discussion with Parish and Thurgood, he had filled out a "miscellaneous report" in response to Mainor allegations about the April 2003 incident, though no such document was produced for the record. (Williams Dep. at 110.)

5

never been made aware of Mainor's allegations about the April 2003 incident. In any case, Williams was not disciplined for the April 2003 incident.

Mainor has brought a three-count suit against CTA and Williams. Count I is a § 1983 claim against CTA and Williams. Count II is a Title VII sexual harassment claim against CTA. Count III is a Title VII retaliation claim against CTA. Defendants have moved for summary judgment of all three claims.

***Legal Standard***

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether any genuine issue of material fact exists, all facts must be construed in the light most favorable to the non-moving party and all reasonable and justifiable inferences drawn in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Once the moving party presents a prima facie case showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleading but must set forth specific facts showing that a genuine issue for trial exists. *Id*. at 256-57.

***Count I: Section 1983 Claim***

In the first count, Mainor brings a claim under 42 U.S.C. § 1983 against both Defendants, CTA and Williams. It is well-settled that municipal liability under § 1983 may not be established

under the theory of respondeat superior. *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992). Indeed, the "discretionary decisions of an employee without policymaking authority" are not sufficient to establish liability under § 1983. *Chortek v. City of Milwaukee*, 356 F.3d 740, 749 (7th Cir. 2004).

Mainor brings this § 1983 claim against CTA on the theory that CTA has a custom or practice of not responding to claims of sexual harassment. In order for Mainor to prevail under such a theory, she would have to show that CTA has unconstitutional policies or customs as manifest in one of the three forms: 1) the enforcement of an "express policy" that causes a constitutional deprivation, 2) a "widespread practice," that, while unauthorized, is so pervasive and well-established that it constitutes a custom or usage with the force of law, or 3) the fact that a person with final policymaking authority caused the harm. *Chortek*, 356 F.3d at 748.

Mainor claims that CTA has a widespread custom or practice of permitting sexual harassment. Mainor relies in part on *Bohen v. East Chicago*, in which the Seventh Circuit affirmed § 1983 liability based on the district court's findings that: 1) sexual harassment was "the general, on-going, and accepted practice" at the East Chicago Fire Department; (2) management officials responsible for working conditions "knew of, tolerated, and participated in the harassment"; 3) the Department had no official policy against sexual harassment; and 4) complaints of sexual harassment "were addressed superficially if at all." 799 F.2d 1180, 1189 (7th Cir. 1986).

Here, Mainor has offered no evidence upon which a reasonable jury could reach a similar conclusion. The record provides no support for Mainor's conclusory allegations that the sexual harassment complaints of other CTA employees were ignored. For example, Mainor claims that

CTA did not discipline Parish – the manager responsible for CTA's disciplinary response to Mainor's complaints – after a former CTA employee, Quinshela Brown, accused Parish of sexually harassing her in 1997. There is no evidence, however, that Brown ever complained to CTA about sexual harassment until she brought a Title VII case against CTA.[10]

Moreover, CTA's disciplinary response to Mainor's complaints went beyond the superficial. *Cf. Bohen*, 799 F.2d at 1189. Whereas the harassers in *Bohen* were never disciplined, *id.* at 1187, Mainor's alleged harasser was suspended for 21 days and ordered to attend mandatory EEO training. It is true that Williams was neither fired nor transferred after the first two incidents, nor disciplined at all for the third and fourth incidents. However, even a finding that CTA violated Title VII by keeping Mainor and Williams at the same workplace after learning of the first two incidents of harassment, and failing to adequately remedy the third and fourth incidents of alleged harassment, would not give rise to § 1983 liability. Indeed, such a finding would not even be sufficient to show that CTA had a custom or practice of ignoring Mainor's complaints, much less a "widespread practice" of ignoring sexual harassment. *See Chortek*, 356 F.3d at 748; *cf. Bohen*, 799 F.2d at 1189 (finding liability where sexual harassment was "the general, on-going, and accepted practice"); *Taylor v. Canteen Corp.*, 69 F.3d 773, 780 n.2 (7th Cir. 1995) (stating that "a plaintiff cannot inflate his evidence by saying the one instance of discrimination for which he has documentation is but an 'example' of a widespread practice").

---

[10] In fact, a review of Brown's case by the Seventh Circuit affirmed summary judgment in favor of CTA, specifically noting that Brown "offer[ed] no evidence to suggest that her [alleged] complaint letters even mentioned the complained-of conduct--let alone described the conduct specifically enough to alert the recipients that Brown considered the conduct sexual harassment." *Brown v. Chicago Transit Auth.*, No. 99-3394, 2000 U.S. App. LEXIS 21292, *8-9 (7th Cir. Aug. 16, 2000).

Mainor also alleges that CTA's failure to take proper corrective action in response to her complaints was the result of the actions of "sufficiently high ranking officials" such that "these actions constitute the policy, custom or practice of CTA." (Pl.'s 2d Am. Compl., ¶ 42.) However, this allegation is facially insufficient to show that CTA engages in unconstitutional policies or customs under the standard set forth in *Chortek*, under which a person with final policymaking authority must cause the harm. *See* 356 F.3d 740, 748. Neither Williams nor any of CTA managers who handled Mainor's complaints was a member of the Chicago Transit Board, which has final policymaking authority for CTA. *See McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 510 (7th Cir. 1993).

Because the record does not support Mainor's allegation that CTA has a custom or practice of not responding to complaints of sexual harassment, I grant Defendants' Motion for Summary Judgment of Mainor's § 1983 claim against CTA.

In order for Williams to be liable under § 1983, Mainor must show that Williams deprived her of a federally guaranteed right while acting "under color of state law." *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). A person's act occurs under color of state law when it is "made possible only because the wrongdoer is clothed with the authority of state law . . ." *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). Employment by a municipality, though relevant, does not determine whether an act was committed under color of state law. *Murphy v. Chicago Transit Authority*, 638 F. Supp. 464, 467 (N.D. Ill. 1986). Actions taken under color of state law "must be related to the state authority conferred on the actor, even though the actions are not actually permitted by the authority." *Id.* at 468. The conduct must "bear some similarity

9

to the nature of the powers and duties assigned to the defendant[]" in order to hold him or her liable. *Id*.

In *Murphy*, the court considered the alleged sexual harassment of a CTA staff attorney at her place of employment by her co-workers, who were also CTA staff attorneys. *Id.* at 466. The court found that the harassing behavior "had nothing to do with and bore no similarity to, the nature of the staff attorney job." *Id*. at 468. Because the harasser's position was limited to representing CTA in legal matters, it "did not and could not give the illusion that sexual harassment, albeit during work hours, somehow related to the nature of that job." *Id*. The court illustrated this principle by comparing a number of police abuse cases:

> [T]he chief of police who assaulted his sister-in-law on the premises of the municipal police station while on duty was not liable under § 1983. Similarly . . . the act of stealing, even by a police officer on duty and in uniform, was held to be a personal, private pursuit and not committed under color of state law. But a police officer who uses excessive force to make an arrest is acting under color of state law . . . as is an officer who effectuates an arrest outside his jurisdiction, even though without actual authority to make the arrest . . .

*Id*. at 467 (citations omitted). Therefore, the supervisors were not acting under color of state law and were not liable under § 1983. *Id.* at 468.

Here, as in *Murphy*, the alleged sexual harassment was not related to the duties and powers incidental to the harasser's position as a bus service supervisor. Because the alleged conduct bore no relation to any state powers assigned to Williams as a bus service supervisor, it could not have occurred under color of state law. Defendants' Motion for summary judgment of Mainor's § 1983 claim against Williams is granted.

***Count II: Title VII Sexual Harassment Claim***

In Count II, Mainor brings a Title VII claim against CTA for maintaining a hostile work environment. In order to establish a prima facie case of hostile work environment sexual harassment, Mainor must show that: "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on [her] sex; (3) the sexual harassment had the effect of unreasonably interfering with [her] work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (citations omitted). Because Mainor has offered facts demonstrating that she was subjected to unwelcome sexual advances on the basis of her sex, I need only address the third and fourth elements.

In order to determine whether, under Title VII, an environment is hostile, I consider all of the circumstances of the alleged harassment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). The effect of the harassment on the employee's psychological well-being is also relevant to this inquiry. *Id*.

CTA contends that the alleged sexually harassing conduct was neither severe enough nor sufficiently pervasive to support a hostile work environment claim. None of the four cases cited by CTA bear out this contention. In *Saxton v. American Tel. & Tel. Co.*, the court held that a hostile work environment did not exist when the plaintiff's manager touched her leg and upper thigh several times, kissed her for several seconds, and, on another occasion, lurched at her as if to grab her. 10 F.3d 526, 528, 537 (7th Cir. 1993). Unlike the present case, however, the

harasser in *Saxton* was transferred out of the plaintiff's workplace after the plaintiff filed a sexual harassment complaint, and no further incidents of harassment occurred after the plaintiff's complaint. *Id*. at 529. Here, Mainor and Williams were kept at the same workplace for almost a year after her complaints to CTA about the initial two incidents of harassment, which were more severe than those alleged in *Saxton*. Moreover, during that post-complaint, pre-transfer period, two additional incidents of alleged harassment occurred.

In *Koelsch v. Beltone Elecs. Corp.*, a co-worker removed his shoe and rubbed his foot against plaintiff's leg and, on another occasion, grabbed her buttocks. 46 F.3d 705, 706-07 (7th Cir. 1995). The court found that the plaintiff had not been subject to a hostile work environment. *Id*. at 708. Unlike the present case, all of the alleged harassment occurred before the plaintiff complained, and no additional incidents occurred after the complaint. Moreover, the conduct in *Koelsch* is objectively less severe and pervasive than that alleged here. Mainor claims that in the first incident, Williams grabbed her head, shoved his tongue in her mouth, groped her breast, and grabbed between her thighs; in the second incident, contrived his way into her home, groped her breast again, and attempted to kiss her; and in the third and fourth incidents, stared at her and grinned in a threatening manner. In *Weiss v. Coca-Cola Bottling Co.*, the plaintiff failed to present evidence of a hostile work environment when she alleged that a supervisor complimented her looks, asked her on dates, put his hand on her shoulder several times and attempted to kiss her in a bar. 990 F.2d 333, 337 (7th Cir. 1993). As in *Koelsch*, the conduct in *Weiss* is less severe than that alleged in the present case.

Finally, in *Dockter v. Rudolf Wolff Futures, Inc.*, a supervisor played with the plaintiff's hair on several occasions; grabbed her waist from behind and said, "I could drive you crazy"; and tried to kiss her several times at a restaurant booth as well as at her apartment building after he

12

drove her home. 913 F.2d 456, 460 (7th Cir. 1990). CTA notes that the supervisor in *Dockter* stopped harassing the plaintiff after she personally reprimanded him, and that the court ultimately denied her Title VII claim. Defendants fail to mention, however, that the court found the alleged conduct to be "'hostile' such as to be actionable under Title VII" and "created a hostile work environment." *Id*. at 460. The *Dockter* court denied the plaintiff's complaint because she had "not alleged or proven an injury," not because the harassment was insufficiently severe. *Id*. at 460-61 (observing that the Plaintiff suffered two weeks of a hostile work environment but then worked for nine more weeks before her termination, which was "not the result of sexually discriminatory motives"). Indeed, the analysis in *Dockter* supports, rather than undermines, the validity of Mainor's claim.

*Hostetler v. Quality Dining, Inc.*, is far more useful in determining whether Mainor was subjected to a hostile work environment. 218 F.3d 798 (7th Cir. 2000). In *Hostetler*, as in the present case, a co-worker allegedly grabbed the plaintiff's face and stuck his tongue down her throat. *Id*. at 801. The next day, the co-worker attempted to kiss Hostetler again, and, "when she struggled to evade him, he began to unfasten her brassiere, threatening to 'undo it all the way.'" *Id*. The court evaluated the impact of the harassment upon her work environment both objectively and subjectively, noting that a "work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Id*. at 807.

Given Mainor's refusal to return to the same workplace as Williams, the record clearly supports the inference that Mainor perceived her work environment to be hostile. Moreover, Mainor has provided evidence sufficient to support the conclusion that Williams' conduct, like that of Hostetler's co-worker, "falls on the actionable side of the line dividing abusive conduct

13

from behavior that is merely vulgar or mildly offensive." *Id*. at 807. As in *Hostetler*, two of the incidents at issue here "involved unwelcome, forcible physical contact of a rather intimate nature." *Id*. A reasonable person in Mainor's position "might well experience that type of behavior as humiliating, and quite possibly threatening," *id*. at 808, and a jury could reasonably find that the physical, intimate and forcible nature of Williams' conduct was in fact severe. Moreover, in order to impose liability upon an employer, harassment need not be both severe and pervasive; "one or the other will do." *Id.*

Having established that the conduct to which Mainor was allegedly subjected meets or exceeds the level required for a hostile work environment claim, I must consider whether there is a basis for employer liability. CTA is liable under Title VII if, once apprised of the sexual harassment, it failed to take appropriate remedial measures. *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999); *Hostetler*, 218 F.3d at 809. The standard imposed is one of negligence. *Smith*, 189 F.3d at 535; *Hostetler*, 218 F.3d at 809. As the Seventh Circuit explains in *Smith*:

> Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care. What is reasonable depends on the gravity of the harassment.

*Smith*, 189 F.3d at 535 (citation and internal quotation omitted).

In that case, Smith was verbally and physically assaulted by a co-worker, Gamble. *Smith*, 189 F.3d at 530-31. After Smith reported the behavior, her supervisor investigated her complaint, interviewed witnesses, and took action to keep Smith and Gamble separated. *Id.* at 531. In reversing summary judgment, the Seventh Circuit found that a jury could reasonably conclude that the employer's "tepid response of separating Smith and Gamble did not effectively remedy the harassment problem." *Id*. at 535.

14

Although the physical conduct in *Smith* was more violent than that to which Mainor was subjected, so too was Smith's employer's remedial response more substantial than that of CTA here. Whereas the employer in *Smith* took actions to keep Smith and Gamble separated, CTA made no such effort. In response to CTA's question in January 2003 about what remedy Mainor sought as a result of her complaints of sexual harassment, Mainor explicitly requested a transfer to another garage. CTA ignored her request.

The mere presence of a harasser who has engaged in particularly severe harassment may be sufficient to create a hostile work environment. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 n. 18 (7th Cir. 1993) (citing with approval *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) (holding that employer's remedy may have been inadequate when it allowed a co-worker to return to the same workplace as plaintiff six months after her complaint about the co-worker's sexual harassment, which consisted of a series of obsessive written and verbal sexual advances but no physical contact). Though CTA's decision not to terminate Williams after the first two incidents of harassment may not demonstrate negligence, the record shows that CTA could have but failed to place Mainor and Williams at different work locations.[11] CTA does not explain why Mainor's request was ignored until December 2003. Following *Smith*, a jury could reasonably conclude that CTA negligently failed to adequately remedy the harassment when it ignored her requests for transfer and kept her at the same work site as Williams in spite of its

---

[11]In addition to Mainor's eventual transfer to North Park Garage, a female bus operator obtained a transfer to another garage upon her request after she reported that she was harassed by Chicago police officers in 2002. Transfers were also granted within one month – and in one instance only two days after a request – to at least four other CTA bus operators, none of whom had filed a complaint of any kind with respect to his or her request for transfer.

15

notice of the harassment that had already occurred, particularly when another alleged incident occurred four months after Mainor's request.

The record suggests that CTA did not take seriously Mainor's complaints about the third and fourth incidents. Although Williams' conduct in those alleged incidents, staring and grinning at Mainor in a threatening manner, was less significant than his prior conduct, these incidents occurred after CTA had notice of the earlier harassment. Viewing the record in a light most favorable to the plaintiff, a jury could reasonably find that CTA effectively – and negligently – ignored Mainor's complaints about the third and fourth incidents. *See Smith*, 189 F.3d at 535.

Because reasonable bases for employer liability exist, satisfying the fourth element of a prima facie case of hostile work environment sexual harassment under Title VII, Defendants' motion for summary judgment of Count II is denied.

### *Count III: Title VII Retaliation Claim*

In order to prevail in a claim of retaliation under Title VII, a plaintiff must show that she engaged in statutorily protected activity, suffered an adverse employment action, and that there is a causal link between the protected activity and the adverse employment action. *McClendon v. Indiana Sugars*, 108 F.3d 789, 796 (7th Cir. 1997). CTA contends that Mainor's retaliation claim must fail because she did not sustain an adverse employment action. Mainor identifies an adverse employment action in CTA's failure to transfer her, which she frames as a "constructive suspension" on the theory that it forced her into unpaid medical leave.

In support of her argument that CTA's failure to transfer her constitutes an adverse employment action, Mainor relies principally on *White v. Honeywell, Inc.*, 141 F.3d 1270 (8th Cir. 1998), and *Pa. State Police v. Suders*, 542 U.S. 129 (2004). However, neither of these cases

supports Mainor's theory, as both are premised on a permanent discharge rather than a suspension. In *White*, the court stated that:

> We believe it is sufficient for a plaintiff to prove that an employer deliberately rendered working conditions intolerable and thus forced the employee to *permanently* "leave" the employment; the employee need not prove that she technically "quit" in every case.

141 F.3d at 1279 (emphasis added). Mainor's alleged constructive suspension was only temporary, and thus does not fit *White*'s model of a constructive discharge. Similarly, in *Pa. State Police v. Suders*, the Supreme Court commented that, "[u]nder the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." 542 U.S. 129, 141 (2004). Thus in *Suders*, as in *White*, the Court contemplated a situation in which the plaintiff's employment ended as a result of the harassment.

The Seventh Circuit has not addressed explicitly the issue of a constructive suspension, but at least one district court has expressed doubt that "our Court of Appeals would uphold a claim based on the constructive discharge line of cases where a complainant's employment does not actually terminate." *Lyon-Scott v. Henderson*, 2000 U.S. Dist. LEXIS 18867, *18 (N.D. Ill. Dec. 28, 2000).[12] In fact, the two other cases upon which Mainor relies for her constructive suspension claim also involved an end to the plaintiff's employment. *Tolbert v. Dave Miller Olds, Inc.*, No. 98 C 5312, 2000 WL 655958, *3 (N.D. Ill. May 19, 2000); *Quiroz v. Ganna Constr.*, No. 97 C 0480, 1999 WL 59836 (N.D. Ill. Jan. 27, 1999). In sum, Mainor fails to cite a

---

[12]As noted in *Lyon-Scott*, the Seventh Circuit has "recognized a claim based on a constructive demotion, analyzing it under the constructive discharge rubric. But unlike the notion of constructive suspension, in a constructive demotion case the plaintiff's employment in the previous position has *ended* and has been replaced by lesser employment." *Id*. at *19 (citing *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 879 (7th Cir. 1999)) (emphasis added).

single case which overcomes the requirement that a claim of a "constructive" adverse employment action involves some sort of permanent change in employment status.

Even if, *arguendo*, Mainor had ended her employment with CTA, she would still have to prove that her "working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation," in order to establish constructive discharge. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). As the court explained in *Tutman*, "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the 'ordinary' case, an employee is expected to remain employed while seeking redress." *Id.*; *see also Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999).

The Seventh Circuit has found violent conduct such as physical assaults and death threats to meet this high standard. *Id.* at 877. Alternatively, less egregious conduct such as harassing phone calls and shunning by co-workers is "unpleasant, but not intolerable." *Id.* (summarizing cases). Williams' conduct in the third and fourth incidents falls in the latter category. While evidence that Williams stared and grinned at Mainor in a threatening manner support Mainor's claim that she was subject to a hostile work environment, these same incidents are not sufficient to establish the objectively intolerable work environment required to sustain a claim of retaliation.

Because Mainor cannot establish that she suffered an adverse employment action, her retaliation claim fails. Defendants' motion for summary judgment of Count III is granted. [13]

---

[13]This result is unusual in that the same set of facts has resulted in opposite outcomes when considered under two closely related legal standards: 1) that for establishing a hostile work environment of sexual harassment; and 2) that for establishing constructive discharge. In the Seventh Circuit, the requirements for constructive discharge are higher than those for hostile

For these reasons, summary judgment is GRANTED with respect to Plaintiff's § 1983 and Title VII retaliation claims, but DENIED with respect to Plaintiff's Title VII sexual harassment claim.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: November 15, 2005

---

work environment. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). As explained in *Tutman*, "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Id*. (internal quotations and citation omitted); *see also Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). In this case, even if Plaintiff had quit her job (which she did not, though she argues that the conditions leading to her "constructive suspension" meet the requirements for a constructive discharge) the work conditions were not objectively "intolerable," and do not meet the requirements of constructive discharge. *See Tutman*, 209 F.3d at 1050; *Simpson*, F.3d at 876-77.